RYAN CAR CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7478.   Promulgated February 15, 1929.

*W. W. Ross, Esq.,* and *James W. Good, Esq.,* for the petitioner.
*J. L. Backstrom, Esq.,* for the respondent.

440

442

OPINION.

SIEFKIN: The petitioner contends that it comes within the provisions of section 327 of the Revenue Act of 1918 and is entitled to have its tax determined as provided in section 328 of that Act.

Section 327 of the Revenue Act of 1918 provides:

That in the following cases the tax shall be determined as provided in section 328:

(a) Where the Commissioner is unable to determine the invested capital as provided in section 326;

(b) In the case of a foreign corporation;

(c) Where a mixed aggregate of tangible property and intangible property has been paid in for stock or for stock and bonds and the Commissioner is unable satisfactorily to determine the respective values of the several classes of property at the time of payment, or to distinguish the classes of property paid in for stock and for bonds, respectively;

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the

tax computed by reference to the respective corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under sections 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

The petitioner claims that there are four abnormalities affecting its capital or income. These contentions will be considered in order.

(1) Petitioner alleges there was an abnormal condition affecting its invested capital caused by failure of respondent to include therein any value for good will.

The evidence discloses that the respondent excluded from petitioner's invested capital an amount of $1,500,000 which petitioner had included for good will. No evidence was introduced by petitioner to directly show that there was a good will. We gather from the record that there was some good will but the petitioner does not attempt to show what it cost or that it is impossible to show the cost. The mere showing that the respondent excluded from invested capital the amount claimed for good will does not prove an abnormality entitling petitioner to special assessment.

In *Denver Powerine Co.*, 7 B. T. A. 1186, in denying the petitioner special assessment, we stated:

Petitioner complains of the exclusion of good will from invested capital, but fails to prove either that the good will was paid in for stock or what amount, if any, was expended in its acquisition or accumulation. (See *Appeal of Watt & Shand, Inc.*, 2 B. T. A. 1273.)

(2) Petitioner alleges that there was an abnormal condition affecting its income caused by the fact that services of large value in securing business were rendered petitioner by stockholders who were paid no compensation therefor by petitioner and whose expenses in securing said business were not paid by petitioner.

Ryan, president of petitioner, testified that from 80 to 90 per cent of the total orders received by petitioner in 1920 were obtained by three stockholders who owned or controlled about 75 per cent of the stock of petitioner in that year. The total amount of business done by petitioner in 1920 amounted to about $7,500,000, and Ryan testified that the normal cost of obtaining such amount of business would be from $200,000 to $400,000. No salaries were paid the stockholders nor were they reimbursed for any expenses. No evidence was introduced to show the amount of expenses which were incurred by the stockholders in obtaining orders.

We are not convinced that the receipt of orders by the petitioner during 1920 was due in a large measure to the activities of the stock-

holders. The evidence shows that there was an enormous amount of repair work on railroad cars to be done in 1920 after the railroads had been returned to private ownership. Apparently the railroads sought out firms which would do the repairs and it was not necessary for such corporations as the petitioner to spend much time or money to secure business. This is evidenced by the testimony of Ryan, which was in part as follows:

&ast; &ast; &ast; So the railroads, then, of course, that we had cultivated and had done some work for, commenced calling on us to undertake unusually large assignments of work, and that was the thing that really led up to our extending our facilities.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;
But we always recognized—it was a general understanding in the business that it was not a stable business; it was emergency business, and we all had that feeling when we expanded our plant in 1919 and 1920. We knew that under normal conditions we would never be able to keep it going, but the situation was there, and the people we had done work for said "We have been good customers of yours; we have to have this help, and you must do something to help us out," and there was the prospect of getting a substantial profit in the work and we went to it.

It will be noted that the petitioner in 1920 did work for only two companies. Petitioner had done work for both of them before and one of them was a customer of several years standing.

We conclude that there was no abnormality in this respect which entitles petitioner to special assessment.

(3) The petitioner contends that there was an abnormal condition affecting its income caused by the fact that its books and records do not contain information from which authorized allowances for obsolescence, deductible from income during 1920, may be computed.

Petitioner contends that a deduction for obsolescence on the plant would have been allowable for the year 1920 but that the books do not show the cost of the old plant, and, since it is impossible to take this deduction an abnormal condition exists.

The evidence discloses that due to the fact that railroads while under Federal control had reached a state of disrepair, after they were returned to private ownership in 1920, there was a large amount of repairing to be done which the railroads could not handle themselves. Due to this condition the petitioner received orders for a large amount of repair work. Its plant was not sufficient to handle the business and a new plant and equipment were installed at a total cost of $462,000. The old plant of the petitioner had been equipped to handle both steel and wooden cars.

Since the fall of 1924 a part of the plant and equipment of petitioner has not been used at all and a part of it has been used to a lesser extent than before. However, we are not convinced that the

petitioner has abandoned the old property. The petitioner in 1922 again had need of all its plant and equipment due to the railroad shopmen's strike and even had to rent an additional plant to take care of the increased business.

The fact that a part of the plant has been in disuse does not necessarily mean that it has been abandoned. As far as the record shows, the petitioner has made no effort to dispose of any part of the plant and equipment and title to it has not been abandoned. The property is not obsolete in the sense that it is out of date. Testimony was introduced to show that there is now no condition existing which would indicate that all of the plant and equipment would ever be needed again. However, the business of the petitioner is an emergency business and an emergency might arise at any time. We believe the plant and equipment of petitioner is in disuse simply by reason of a lack of business, and no deduction for obsolescence would be allowable in 1920. It follows that the impossibility of determining the cost of the assets in disuse does not create such an abnormality as is referred to in section 327.

(4) Petitioner contends that there was an abnormal condition affecting its income caused by the fact that the petitioner made large capital expenditures in 1920, which were charged to capital accounts but useful only for the purpose of handling a temporary peak load of business during the year 1920.

Our discussion of the previous contention disposes of this one. The usefulness of the capital expenditures was not confined to the year 1920. Even if it were there would be no abnormality entitling petitioner to special assessment.

In *Chillicothe Bottling Co.*, 2 B. T. A. 340, the petitioner, in order to be in a position to sell its output and supply the demand of an Army cantonment located at Chillicothe, made expenditures of a capital nature in the sum of $20,000. The petitioner contended that the expenditures for machinery were made necessary because of the war condition, that this machinery was unproductive to a great extent after the cessation of the war activities, and that the apparent extraordinary profits during the year 1918 represent a realization in one year of the earnings of capital unproductively invested or employed through a period of years. We denied special assessment in that case.

The petitioner having failed to show any abnormal condition affecting its invested capital and income for the year 1920, is not entitled to special assessment.

*Judgment will be entered for the respondent.*